Roxie McDONALD, Executrix of the Estate of
Hazel PETTY, Deceased *v.* Ray Dale PETTY et al

73-50                                   496 S.W. 2d 365

Opinion delivered June 18, 1973
[Rehearing denied July 23, 1973.]

*Gibbs Ferguson,* for appellant.

*Paul K. Roberts,* for appellees.

Frank Holt, Justice. The appellees initiated this action to enforce an oral contract to make a will, to cancel their respective deeds, and for an accounting. The appellees are the surviving five brothers and sisters (including their spouses) of the deceased, Frank Petty, who allegedly agreed to make a will devising to appellees certain property deeded to him by them.

The appellees and their brother Frank each acquired a 1/6 interest, as surviving heirs, in a 95 acre farm upon their father's death in 1959. Approximately three years later, appellees conveyed their respective interests to Frank by warranty deeds reciting a consideration of $3,000 each. Frank died approximately 8 years later, intestate and

without issue, and the property became vested in Hazel, his wife of 28 years, pursuant to Ark. Stat. Ann. § 61-149 (1971 Repl.). Hazel died after the trial to enforce the alleged oral contract and before a decree was entered. Appellant was appointed executrix of Hazel's estate and the action was revived in her name.

It was alleged by appellees that Frank constantly importuned them to sell their interests in the farm to him; that they didn't want to sell; that he promised if they would deed him their interests he would execute a will and devise the farm back to them; that he threatened he would kill them if they failed to make such deeds; that, fearing for their lives and relying on his promise to make a will, they deeded the lands to Frank. They, also, alleged failure of consideration and prayed for cancellation of the deeds and an order directing conveyance of the lands. These allegations were denied by Hazel Petty, Frank's widow.

The chancellor found, *inter alia,* that appellees had met their "heavy burden of proof" to establish that an oral contract was made to make a will devising the farm to appellees. We have long recognized that an oral contract to make a will to devise or a deed to convey real estate is valid when the testimony and evidence to establish such a contract is clear, cogent, satisfactory, and convincing. *Williams* v. *Robinson,* 251 Ark. 1002, 476 S.W. 2d (1972). The evidence "must be so strong as to be substantially beyond reasonable doubt." *Walk* v. *Barrett,* 177 Ark. 265, 6 S.W. 2d 310 (1928); *Crowell* v. *Parks,* 209 Ark. 803, 193 S.W. 2d 483 (1946). In the case at bar, upon a review of the evidence, we must agree with appellant that it does not meet the quantum of proof that is required for the specific performance of the alleged oral contract to make a will devising the lands.

Appellees testified that the $3,000 was only a partial consideration for their deeds. They said, as alleged, that Frank promised to will the property back to them. Further, that in his obsession to own the property he coerced them into deeding their respective interests to him by threats of physical harm to the extent of killing them unless he acquired the property; also, that he would kill

anyone who bid on the property against him. One of the appellees, Ray Petty , said Frank threatened him by the use of a pistol the night before he made his deed. Some of the appellees testified that Frank, also, promised to will to them half of everything else he possessed. In answer to an interrogatory, one of the sisters stated that he promised to make her beneficiary of a $10,000 life insurance policy. It was appellees' understanding that the conveyances to him were with the assurance that the property would be kept in the family.

Three years after the death of appellees' father, or before appellees' deeds were made to Frank, a partition action was commenced by one of the appellees, Ray Petty and his wife, residents of Arkansas, against his non-resident brothers and sisters (appellees and Frank) and their spouses. The court found that the lands were incapable of partition in kind and should be sold and the proceeds divided equally between the heirs. The clerk of the court was appointed commissioner and a public auction was set for December 8, 1962. On November 26, 1962, appellee Smart and her husband conveyed their interests by a warranty deed to Frank. They resided in Oregon and according to them his promise to make a will was communicated by phone and at a later date in person to Mrs. Smart. The Newtons, who also resided in Oregon, conveyed their interest to Frank by warranty deed in November, 1962. However, the exact date is not legible on the deed. According to them, the oral promise to make a will was by phone. The McGinnises, who resided in Texas, said that because of threats by Frank and his promise to make a will they conveyed their interest by warranty deed on December 5, 1962. The deed was signed by them in the presence of a lawyer in Texas. Two days later they were accompanied by Frank and Hazel, who also lived in Texas, to Arkansas to attend the scheduled public sale. It appears that the McGinnises had the benefit of a local lawyer at the scheduled sale. Gus and Dorothy Petty, who resided in Texas and attended the scheduled sale, conveyed to Frank their interest by a warranty deed on December 8, 1962, the sale date. Dorothy testified the deed was made because of Frank's threats and promises to make a will. Her husband was too ill to testify. The warranty deed was signed by them in the

presence of and with the counsel of their own lawyer. Ray and Mary Petty, who initiated the partition sale, conveyed their undivided interest to Frank by warranty deed, also, on the sale date of December 8, 1962. Their deed, according to them, was made due to his threats and promises to make a will. They were, also, represented and counseled by their own attorney.

The partition sale, which was attended by several bidders, was not conducted as scheduled. On that very date Ray and Mary Petty petitioned the court, however, to vacate the sale order asserting "that Frank A. Petty has acquired the interest of all other owners of said property, said owners being named as defendants in this action, and now owns said property completely." It is undisputed that each of the appellees received $3,000 for their respective interests.

Appellees testified that they considered the 95.27 acre farm to have a value of $400 an acre in 1962 or approximately twice what they were paid. Their own witness, an adjoining landowner, who attended the scheduled sale, testified, "I don't know if I could say specifically what the land was worth in 1963 . . . . You know, putting the 96 acres with any large tract . . . . then I might have paid $200 and $250 [per acre] for this 95 acre tract [i.e., $19,000 to $23,750] . . . . [T]here was a neighbor of mine up there that owned a tract of land at that time that joined this property that you are talking about. . . . I imagine that he would have paid the figure that I mentioned there." Appellant's witness, a local professional appraiser, testified that the farm had a fair market value of $17,862 as of December, 1962. It is significant that this local appraiser had, in fact, previously appraised the lands in 1959 or 1960 at the specific request of appellee Ray Petty, himself. This appraisal preceded Ray's partition action.

In addition to paying each of the appellees $3,000 for their interests, Frank, also, paid $450 which his brother Ray owed for attorney's fees in the partition action he had instituted against his non-resident brothers and sisters. There was, also, an assumption by Frank of $1,675.93 loan against the land. By counting Frank's 1/6 interest, the total consideration involved for the farm would be

$20,125.93. Thus, it appears the appellees received a fair price for their respective interests.

Hazel testified that she never heard her deceased husband promise to make a will. Further, that he didn't have a pistol and that he was not of a violent disposition and never "got into a fight with anyone." "He was kind and considerate." She testified that he had purchased a house in a town near the farm for his parents and sent them sums of money periodically. His non-violent disposition was corroborated by the tenant who had rented the farm continuously since 1956 or originally from appellees' father. According to her, Ray wanted his money out of the property, "put it up for sale," and sold his interest after the others had done so "cause he would get more out of it that way." Also, the appellees seemed well pleased with the transactions and they were "real sweet to me." Hazel was suffering from cancer when she testified and died approximately a year following the trial.

Frank had previously purchased other lands in the vicinity from his father and a brother. It appears undisputed that after Frank acquired the deeds from appellees to the 95 acre farm he received the rental payments from the land during the eight years preceding his demise and no demands were ever made upon him to execute a will. There is no evidence from any disinterested witness that there was a promise to make a will or threats made in order to secure appellees' deeds. To the contrary, court officials testified they could not recall any "fussing or arguing or loud talk" among the appellees and Frank on the date of the scheduled partition sale at which time the last two warranty deeds were signed by Ray, his wife, and Gus, his wife, in the presence of and with the counsel of their own attorney.

In these circumstances we cannot say the evidence was sufficiently clear, cogent, satisfactory and convincing to be substantially beyond a reasonable doubt that an oral contract was made to make a will to devise the farm. *Walk* v. *Barrett, supra,* and *Crowell* v. *Parks, supra.* It is true that § 61-149, *supra,* (Act 303 of 1969) changed the law as to ancestral estates. However, it does not appear logical that the appellees would accede to their brother's

asserted hostility and threats and at the same time rely upon his oral promise to make a will without requiring some limitation in their respective deeds which conveyed their interests absolutely. It appears, as indicated, that most of the appellees were represented and counseled by their own attorneys in the preparation and making of their warranty deeds. The evidence does not justify the finding of an oral contract to make a will and the cancellation of the solemn and unrestricted recitals of the respective warranty deeds, each of which is supported by a fair and adequate consideration. We deem it unnecessary to discuss appellant's other contentions for reversal.

Appellees urge, by a motion to dismiss, that an action to recover land must be revived in the names of the heirs of the parties who die during during the pendency of an action as provided by Ark. Stat. Ann. § 27-1014 (1971 Supp.) instead of in the name of a personal representative as in the case at bar. Although the appellees reserved the right to object to the revivor action, no objection was ever raised until after the cause reached this court on appeal. Therefore, since this issue is presented for the first time on appeal, we do not reach it. *Griffith* v. *Rozell*, 252 Ark. 280, 478 S.W. 2d 762 (1972). Furthermore, in the case at bar, the burden to have the action properly revived falls upon the plaintiffs, the appellees, who are the ones seeking to establish their title to the land.

The decree is reversed.

FOGLEMAN, J., concurs because he feels that the decree was clearly against the preponderance of the evidence.